GEORGE DEUKMEJIAN and JEAN DEUKMEJIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deukmejian v. Commissioner
Docket No. 5237-79.
United States Tax Court
T.C. Memo 1981-24; 1981 Tax Ct. Memo LEXIS 723; 41 T.C.M. (CCH) 738; T.C.M. (RIA) 81024; January 26, 1981. Charles S. Wulke, for the petitioners. Edward M. Robbins, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1974 in the amount of $ 20,692. In an amended answer respondent claimed an increase in the deficiency making the total deficiency $ 30,314.20. One of the issues raised by the pleadings has been conceded by petitioners, leaving for decision the following: (1) the fair market value of a parcel of real property donated by petitioners to the City of Glendora, California, on December 30, 1974, and (2) if the fair market value of the property exceeds petitioners' basis in the property, whether their charitable contribution is limited by section 170(e)(1)(A), I.R.C. 1954, [1] because the property had not been held for more than six months. FINDINGS OF FACT Some of the facts have been stipulated and are *726 found accordingly. George Deukmejian (petitioner) and Jean Deukmejian, husband and wife, resided in Glendora, California, at the time of the filing of their petition in this case. Petitioners filed their joint Federal income tax return for the calendar year 1974 with the Internal Revenue Service. Petitioner is a businessman and during the year here has been conceded by petitioners, leaving for decision the following: (1) the fair market value of a parcel of real property donated by petitioners to the City of Glendora, California, on December 30, 1974, and (2) if the fair market value of the property exceeds petitioners' basis in the property, whether their charitable contribution is limited by section 170(e)(1)(A), I.R.C. 1954, [1] because the property had not been held for more than six months. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. George Deukmejian (petitioner) and Jean Deukmejian, husband and wife, resided in Glendora, California, at the time of the filing *727 of their petition in this case. Petitioners filed their joint Federal income tax return for the calendar year 1974 with the Internal Revenue Service.
Petitioner is a businessman and during the year here in issue was employed by an automobile dealership. In late 1973 or early 1974, petitioner learned of a large tract of property (Girl Scout property) consisting of 257.83 acres located in the foothills of the San Gabriel mountains which was for sale. The property was owned by the Angeles Girl Scout Council and petitioner was told to contact Mr. H. Fred Christie, who was at that time the director and treasurer of the Angeles Girl Scout Council. Petitioner and Mr. Christie engaged in negotiations with respect to the property for a period of about four to five months. In early April 1974 petitioner's offer of $ 200,000 for the entire property was accepted. On April 11, 1974, the parties entered into an escrow agreement which contained the following terms of sale: $ 100,000 was to be paid on or before July 1, 1974, the stated date for the termination of escrow, of which $ 5,000 was to be paid on the signing of the escrow instructions and the remaining $ 95,000 to be paid prior to *728 closing. The balance of the $ 200,000 was to be paid in the form of a $ 100,000 noninterest-bearing note secured by a deed of trust on the property which was due on or before February 1, 1975. The escrow instructions were signed by petitioner on April 21 and Mr. Christie signed them on April 22. On June 7, 1974, a representative for the Angeles Girl Scouts signed the Grant Deed for the conveyance of the Girl Scout property to petitioner and placed the deed into escrow. Petitioner paid the $ 5,000 deposit on May 7 and a check for $ 95,166 was given to the escrow agent on July 1. On July 5 the escrow agent used the cash deposited by petitioner to pay off the liens which encumbered the Girl Scout property. The deed transferring the property to petitioner and the deed of trust securing petitioner's purchase money note were both recorded by the Title Insurance and Trust Company on July 5, 1974, and escrow was closed on that date. The Girl Scout property is located in the foothills of the San Gabriel mountains in the City of Glendora, California. It had been the site of "Camp Aventura" but the property had not been used by the Girl Scouts for approximately three years prior to the *729 time of purchase. The parcel contained 30 to 35 acres of flat to gently sloping land which was ideal for residential development and the balance of the property was steep mountainous land. The gently sloping portion of the property is bordered by Palm Drive to the south and Grand Avenue to the east but the balance of the property has no direct access. In March 1975, a new single family residential subdivision was being completed on Grand Avenue, south of Palm Drive approximately 1/2 mile from the property. At the time of trial, the property immediately to the south of Palm Drive was fully developed with residential houses ranging in value from $ 100,000 to $ 200,000. The Girl Scouts had built a number of structures on the flat to gently sloping land including a caretaker's house, mess hall, garage, bathhouse, and a swimming pool. Most all of these structures were in a state of disrepair as the buildings had not been used or maintained for a number of years and were therefore of negligible value. The accessible portion of the property was enclosed by a chain-link fence. There were four entrances to the property each of which had a gate which was locked at all times. In *730 the latter part of April or the first part of May 1974, petitioner contacted the Girl Scout officials and asked them for a complete set of keys.Mr. Christie saw no reason why petitioner should not have a set and by the first part of May the Girl Scouts issued him a set of keys to the property. Between the first of May and the first of July, petitioner, his wife, his daughter and her family would travel to the property on weekends and would remove weeds and debris from the relatively flat parcel of land and then enjoy a family picnic. Petitioner's son-in-law also used a Ford tractor in May and June, which was owned by the Girl Scouts, to clear the property. The keys to the tractor were obtained from the caretaker employed by the Girl Scouts and were returned to him afterwards or were left on the tractor. This work was done in anticipation of moving trailer houses for petitioner and his daughter and son-in-law onto the property until their permanent residences could be built there. During the month of June 1974, the Girl Scouts removed from the Girl Scout property, with petitioner's permission, one refrigerator, one double stove and hood, one pot sink, one triple metal sink, one *731 salad table, seven toilets, four single sinks, four triple sinks, one stainless sink, one double stainless sink, one triple stainless sink, two utility sinks, eight dishwashing tables, three sheepherder stoves, four redwood benches, two mirrors, and one medicine chest. On his return for the dalendar year 1974, petitioner claimed a charitable contribution deduction for these items in the amount of $ 2,211. [2]
Harold G. Denny was employed by a third party and, among his duties, he worked as a gardener on petitioner's property located in Studio City, California. In the first part of May 1974, petitioner asked Mr. Denny to visit the Girl Scout property and offered him the job of being the caretaker on the property. In the first week of June, Mr. Denny decided to accept petitioner's job offer. On June 21 Mr. Denny and his family started to move some of their personal belongings to the caretaker's house on the Girl Scout property and began to clean and paint the house *732 at night and during the weekends. The move into the caretaker's home was completed on the 29th of June as Mr. Denny had to be out of his old house by June 30, 1974. At the time he began moving in, Mr. Denny was given keys to the buildings and to the entrance gates to the property. Petitioner incurred and paid bills for utilities used on the Girl Scout property beginning in the month of June 1974. Sometime prior to June 24, 1974, petitioner requested that the electricity be restored to the property and he received a bill in the amount of $ 154.05 for service from June 24 to August 22, 1974, from the Southern California Edison Company. Petitioner was billed by the Glendora Water Department for water service from June 27 to July 11, 1974, in the amount of $ 4.98. The septic tank attached to the caretaker's house was pumped out in the month of June and petitioner received a bill for $ 35 dated June 29, 1974. On December 30, 1974, petitioner donated a portion of the Girl Scout property (donated property) to the City of Glendora, California, a qualified charitable organization defined in section 170(c). The Grant Deed reflecting the transfer of the donated property was recorded *733 in the County of Los Angeles on December 30, 1974. The Grant Deed contained the following restrictive language: This grant is upon condition that said property be used solely for open space and public utility purposes until January 1, 2025. If said property is not used solely for open space and public utility purposes until January 1, 2025, then George Deukmejian, his heirs, assigns and successors, without paying any compensation for any buildings or other improvements or betterments that may then be upon said premises, and without paying any compensation or incurring any liability for damages or losses of any kind, may re-enter in and upon, and take possession as if this conveyance had not been made. This restriction was placed in the deed at the insistence of city officials to insure that the property would not be used for any purposes other than for open space and public utilities. Petitioner by Grant Deed, recorded on May 2, 1978, conveyed his retained right of re-entry in the donated property to the City of Glendora. On January 6, 1975, the mayor of the City of Glendora wrote petitioner a letter thanking him for the gift of the land and attached a copy of the resolution *734 passed by the City Council on December 10, 1974, in which the city officially accepted the gift. The donated property consists of 28.93 acres, of which 0.29 acres are subject to a Flood Control District easement, leaving a net area of 28.64 acres.The property has an "L" shape measuring 1,650 feet long and a width of 1,320 feet along the northern boundary and a width along the irregular southern boundary of 440 feet. The parcel is located about 0.25 miles north of Palm Drive and about 0.25 miles west of Grand Avenue, if it were extended which it had not been at the time of trial. The elevation of the property rises from approximately 1,200 feet on the southern border to 2,000 feet on the northwestern portion of the property. This translates into a slope of approximately 50 percent, meaning that for every 2 feet of distance the elevation falls 1 foot. The property is raw unimproved land which is very steep and covered with scrub brush, wild grasses, and a few small trees. As a result, the land would be difficult to walk on for any length of time. The property was zoned E-7-200,000 which would allow for residential development with minimum lot sizes of 200,000 square feet or *735 5 acres. There were no utilities on the property in 1974. However, there were school buildings not more than 400 to 500 feet from the southern border of the property which did have electrical power. Due to the slope and elevation of the property, there was no reservoir which could directly feed water onto the property by gravity flow. Therefore, pipes would have to be laid and a pumping station would have to be constructed in order to provide running water to the property. There were no roads providing access to the donated property and there were no easements which would permit the construction of a road across the private or government owned property which surrounded it. In view of the terrain, even if an easement could be obtained, the construction of a road to the property would be very expensive. The following schedule sets forth sales of certain properties situated along the San Gabriel mountain range and located from 2-1/2 to 19 miles from the subject property, during the period from July 5, 1974, to March 4, 1977: Total
Total
Price Per
Date
Grantor
Grantee
Consideration
Acreage
Acre
7-5-74
Angeles Girl
Deukmejian
$ 200,000
257.83
$ 776
Scout Council
7-14-75
Foster
Jeffrey
40,000
40.00
1,000
5-13-73
Garland Et al
Grieve
45,000
160.00
281
5-9-75
Hixon and
Romvary Et al
75,000
395.28
190
Security Pacific
5-5-75
Michels
Nuccio
10,000
40.00
250
2-28-75
Joyce
Reynolds
6,800
35.86
190
3-4-77
Murphy Et al
U.S. Forest
17,200
163.8
105
Service
*736 The first sale listed above was the purchase of the larger Girl Scout property by petitioner as described above. The remaining six sales were of rough open hillside property. There were differences among these properties principally as to size and location but also as to access, utilities, and zoning. The following schedule sets forth sales of certain properties in the foothills of the San Gabriel mountains in or near the City of Glendora, California, and in the general vicinity of the donated property during the period from July 25, 1972, to September 24, 1974: Total
Total
Price Per
Date
Grantor
Grantee
Consideration
Acreage
Acre
12-24-73
Warren
Senise
$ 140,000
39.6
$ 3,535
7-25-72
Federal Savings
Angello
35,000
7.39
4,736
and Loan
5-29-74
Coussoulis
Hacienda
150,000
67.75
2,214
Enterprises
9-24-74
Foster
Chase
50,000
40.0
1,250
At the time of sale, each property listed above was open land although each of the properties was suitable for residential development. There were differences among these properties as to size and access and also as to utilities and location. All of these properties had locations *737 and access superior to the donated property and were more accessible to utilities. The 40 acres which were sold on September 24, 1974, had access by a road through a National Forest which was controlled by a gate during the fire season. At the time of sale this property had a cabin-type building on it. On his Federal income tax return for the calendar year 1974, petitioner claimed a deduction for the contribution of the donated property to the City of Glendora in the amount of $ 63,000. Attached to his return was a letter to petitioner from an appraiser which stated the fair market value of the property to be $ 2,200 per acre or $ 63,000 and a letter from the City of Glendora dated January 6, 1975, acknowledging the gift of the land. Respondent, in his notice of deficiency for the calendar year 1974, disallowed petitioner's charitable contribution of $ 63,000 to the extent it exceeded $ 22,225. [3] *738 In his amended answer, respondent alleged that the charitable deduction should be limited to $ 5,441, the fair market value of the property at the time of the donation. [4]
ULTIMATE FINDING OF FACT The fair market value of the donated property on December 30, 1974, was $ 22,225.
OPINION There is no question that petitioner is entitled to a charitable deduction under section 170(a)(1). The deed transferring the real property to the City of Glendora was recorded on December 30, 1974, and the property was to be used exclusively for public purposes, thus qualifying as a *739 "charitable contribution" as defined under section 170(c)(1). [5] The only question presented is the amount of the charitable contribution. [6]
Section 1.170A-1(c)(1), Income Tax Regs., provides that when a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property *740 at the date contributed reduced when necessary as provided in section 170(e)(1). The fair market value of property is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Section 1.170A-(1)(c)(2), Income Tax Regs. The fair market value of property at any given date is a question of fact to be decided on the basis of all the evidence and no set rules, methods or formulas are controlling. Newaygo Portland Cement Co. v. Commissioner,27 B.T.A. 1097, 1106 (1933), affd. 77 F.2d 536 (D.C. Cir. 1935). Respondent raised the issue of the fair market value of the contributed property being less than $ 22,225 in an amended answer. Therefore, respondent has the burden of proving that the fair market value was below $ 22,225, the amount of the deduction allowed in the deficiency notice. Rule 142(a), Tax Court Rules of Practice and Procedure.
In considering the question of fair market value, it is necessary to decide whether the property should be valued as restricted property or as property owned *741 in fee simple. The Grant Deed which conveyed the donated property to the City of Glendora stated that the grant was "upon condition that said property be used solely for open space and public utility purposes until January 1, 2025," and if the property was not so used then petitioner "may re-enter in and upon, and take possession as if this conveyance had not been made," without compensation. This language created a fee simple subject to a condition subsequent with a retained right of re-entry. See Cal. Civ. Code, sections 707, 708, and 1438 (West). Petitioner contends that the property should be valued in fee simple, which was the state of the title of the property in petitioner's hands immediately before he transferred it. This argument is based on the fact that petitioner offered to transfer the property in fee simple but the city officials requested that the restriction be placed in the deed. We disagree with petitioner's contention. It is well settled that the donor is entitled to a deduction for a charitable contribution of property equal to the fair market value of the contributed *742 property or interest therein subject to any restrictions on marketability on the date of the contribution. See Cooley v. Commissioner,33 T.C. 223, 225 (1959), affd. per curiam, 283 F.2d 945 (2d Cir. 1960). In Fargason v. Commissioner,21 B.T.A. 1032, 1037-1038 (1930), after determining the fair market value of real property contributed to a charitable organization, we stated that the amount so determined should be reduced in view of the fact that the property was given subject to a condition subsequent. For the above reasons, we conclude that the property in the instant case should be valued as restricted property suitable only for use as open space or for public utility purposes. Petitioner contends that the value of the donated property on December 30, 1974, was $ 2,200 an acre or $ 63,000. Petitioner bases his contention on the testimony and written appraisal dated March 12, 1975, of a real estate appraiser. Petitioner's expert was well qualified and familiar with the area. His appraisal was based on the conclusion that the highest and best use for the donated property would be for development as low density, single family *743 residential homesites. Since the property was vacant land, he used the comparable sales approach in determining the fair market value. Petitioner's expert, after 24 hours of research, determined that there were three sales which were comparable to the donated property and they ranged in price per acre from $ 2,214 to $ 4,736. He concluded that, with adjustment for the differences in location, size, and terrain from the donated property, the adjusted price per acre for these three sales would range from $ 2,000 to $ 2,400. On that basis, it was his opinion that the donated property had a fair market value of $ 2,200 per acre. Petitioner's expert concluded his report by stating that "The opinion of value assumes the property is free and clear of encumbrances * * *." Respondent's expert also had good credentials and used the comparable sales method of valuation. He was of the opinion that even though the donated property was zoned for low density, single family residential development, such use was not practicable due to the deed restriction limiting the use to open space or for public utility purposes. Based on the restriction and the fact that it would be difficult to provide *744 access and water and electricity to the property, respondent's expert concluded that the highest and best use for the property would be as open space hillside. After approximately 200 hours of research, he selected three sales which he considered comparable and they ranged in value from $ 171 to $ 210 per acre. Based on these findings, it was his opinion that the fair market value of the donated property was $ 210 per acre or a total of $ 6,014. Based on all of the evidence presented, we do not agree with the conclusion of either expert. The opinion of petitioner's expert is incorrect not only because the comparables he used were properties better situated and more desirable than the subject proprty, but also because he valued the donated property on the assumption that it was free and clear of all liens and encumbrances. In fact, the property was restricted by a condition subsequent limiting the use to open space or for public utility purposes. Furthermore, this record shows that at the time of the gift the best usage of the property was for open space although it might, at a later time, have been suitable for other uses. On the other hand, the comparable sales selected by *745 respondent's expert were remote parcels of land not in close proximity with the donated property. The three sales selected as most comparable ranged from approximately 11 to 19 miles west of the donated property. Also these properties were not located near a city whereas the subject property was in the City of Glendora. We could dispose of this case on the basis that petitioner has failed to show a value higher than the $ 22,225 determined by respondent in his notice of deficiency and respondent has failed to show a value lower than that amount. [7] However, in our view the record as a whole supports a value of $ 22,225 for the property. While both experts listed the purchase of the entire Girl Scout tract by petitioner as a potentially comparable sale, they each dismissed the sale as being a good indicator of the value *746 of the donated property. Petitioner's expert did so because of the large size of the property and respondent's expert did so because, in his opinion, based on other sales in the area, the price petitioner paid for the property was well below the usual price for property of this type.The record is clear that the purchase and sale of this property was an arm's length transaction. In other words, petitioner was a willing buyer and the Girl Scout Council was a willing seller. There is no indication in the record that both parties were not knowledgeable at the time of negotiating the sale of prices of properties in the area. In view of all the facts and circumstances and using our best judgment, we find that the fair market value of the donated property on December 30, 1974, was $ 22,225. In our view, the per acre price paid for the larger parcel of Girl Scout property is highly relevant to our determination here of the fair market value of the donated property. In fact, the price determined for a piece of property in a sale between parties dealing at arm's length is persuasive evidence of *747 the actual fair market value of that property. Narver v. Commissioner, 75 T.C. at p. 72 of slip opinion (Oct. 9, 1980). While in some instances the average price per acre of property of the size of the Girl Scout property might not be indicative of the value per acre of a smaller portion of the property, in the instant case this is offset by a number of factors. First, the relatively flat 30 to 35 acres of the property has been shown to be far more valuable than any other portion of the property. However, the record also shows that most of the remaining acreage was inferior to the donated property. In addition, on the negative side, the average price per acre should be reduced because the donated property is restricted as to use, but on the other hand, it should be increased because this particular portion of the property had a good location in the City of Glendora. A fair market value price of $ 776 per acre for the donated property is supported by two other factors. First, petitioner's expert stated that the donated property represented about the average of the entire Girl Scout tract in terms of slope and terrain.Second, it is well within a reasonable *748 range of the highest per acre price paid for a property included in the report of respondent's expert of $ 1,000 and the lowest price for a property included in the report of petitioner's expert of $ 1,250. There were some advantages to the properties which sold for $ 1,000 and $ 1,250 per acre over the donated property as to access and utilities. Also the property which sold for $ 1,250 per acre had a building on it and the record does not show the value of the building. These two properties, though overall somewhat superior to the donated property, are more indicative of the value of the donated property than any other property for which a sale is shown in the record. Because the fair market value of the property was the $ 22,225 determined by respondent in the notice of deficiency, we do not reach the issue of whether petitioner's charitable contribution was limited by section 170(e)(1)(A). [8]
*749 Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise stated.↩
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise stated.↩
2. The amounts of the items contributed actually added up to $ 2,210. This claimed deduction was not disallowed by respondent in the notice of deficiency or placed in issue by respondent in his amended answer.↩
3. Petitioner on his tax return claimed a total charitable contribution deduction of $ 65,511 computed as follows: Cash contributions $ 50; Angeles Girl Scout Council, $ 2,211; Grace Episcopal, $ 250; City of Glendora - Land, $ 63,000. Respondent in his notice of deficiency disallowed $ 40,775 of petitioner's claimed charitable contribution deduction with the following explanation: It is determined that you are allowed a charitable contribution deduction in the amount of $ 24,736.00, the fair market value of land contributed, in lieu of $ 65,511.00 claimed on your tax return for the taxable year 1974 because it has not been established that land contributed to the City of Glendora is long-term capital gain property for purposes of computing the charitable contribution deduction in accordance with section 170 of the Internal Revenue Code of 1954. Therefore, your taxable income is increased $ 40,775.00 for the taxable year 1974. [
[At the trial both parties recognized that respondent in his notice of deficiency had limited the claimed charitable deduction for the land to $ 22,225 which was the amount of the acreage donated multiplied by the mathematical average price per acre. ($ 200,000./. 257.83 = $ 776 -- $ 776 X 28.64 = $ 22,225.)]
*] If the determination set forth immediately above is not sustained, then it is determined in the alternative that the amount of allowable deduction for the taxable year 1974 is limited to thirty (30) per cent of your contribution base for the taxable year 1974.↩
4. On brief, respondent conceded that the fair market value of the property contributed was $ 6,014 but also contended that petitioner's basis in the donated property did not exceed $ 6,014 if proper allocation of the purchase price of the property was made to acreage of different values.↩
5. Sec. 170(c) provides in part as follows: (c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- (1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes. ↩
6. The parties stipulated that the amount of the allowable charitable contribution is limited under section 170(b)(1)(D) to 30 percent of petitioner's contribution base as defined in section 170(b)(1)(E)↩.
7. Petitioner in his brief argues that respondent in the notice of deficiency accepted the $ 63,000 value for the property. In footnote 3 we have quoted the portion of the deficiency notice dealing with the disallowance of a part of the charitable deduction claimed by petitioner. We do not interpret respondent's notice of deficiency as does petitioner.↩
8. Although respondent argued in his brief that petitioner's basis in the donated property was less than $ 22,225, this issue was not raised in the pleadings. Furthermore, the evidence does not support the contention of respondent that petitioner's basis in the property was less than $ 22,225.↩